UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                            CASE NO. 8:25-cr-530-CEH-LSG

HON NING HO

## **UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR DISTRICT COURT REVIEW OF THE MAGISTRATE JUDGE'S DETENTION ORDER AND REQUEST FOR PRETRIAL RELEASE**

The United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, files this Response to Defendant's Motion For District Court Review Of The Magistrate Judge's Detention Order and Request For Pretrial Release and, in support thereof, states as follows:

The defendant was indicted under seal in the instant case on November 13, 2025 and arrested in Tampa, Florida on November 19, 2025. Docs. 1,2 and 12. On November 19, 2025, the defendant made an initial appearance before the Honorable Sansone, during which a detention hearing was held based upon the Government's Motion for Detention. Doc. 22. Based upon the pre-trial services report, the Government's proffer and defense presentation, Magistrate Judge Sansone detained the defendant as a risk of flight. Doc. 25. Judge Sansone specifically found the reasons for detention as a flight risk were: 1) the weight of the evidence is strong, 2) the defendant is subject to a lengthy period of incarceration if convicted, 3) the defendant has significant family or other ties outside the United States, lack of stable employment and prior failure to appear in court as ordered. Id

at 3.  Perhaps just as significant were Judge Sansone's Other Reasons Or Further Explanation: as set forth at Doc. 25 at 4, which states:

> "Extremely serious allegations that sending powerful computers with immense processing power.   The items allegedly sent are prohibited from being sent from the United States to China because of the national security threat associated with China having these computers.   Over $3.8 million wired directly from China during the conspiracy. If he flees to China, the United States would not be able to extradite him back to the United States.   He also failed to disclose that he also had a passport from Great Britian (instead it was located during the search of his residence)."

On December 8, 2025, the defendant filed the instant Motion. Doc. 42.   This Honorable Court Ordered the United States to respond by December 16, 2025. Doc. 46.

The defendant argues potential sentences imposed for the offense charged could, upon conviction, involve sentences ranging from 210-262 months to 30 to 47 months.   The defendant maintains the weight of the evidence should be minimized due to the presumption of innocence, the defendant's history and characteristics, including his ties to the United States, his marriage, church, his medical and mental conditions, lack of substance abuse and his failure to appear for court as ordered on a traffic offense justify his release on bond pending trial.

The defendant proposes conditions including a secured bond determined by the Court, surrender of all passports, execution of a 4th Amendment waiver permitting a search of his home and business, third party custodian, and any other conditions set by the Court.

The factors weighing for detention paint an entirely different picture.

Significantly, virtually all the factors supporting pre-trial release rely upon circumstances that co-existed during the course of the defendants' criminal scheme over a period of years that resulted in the charges set forth in the Indictment.

The nature of the charges are a significant factor in the risk of flight, as recognized by Judge Sansone in determining that the defendant needed to be detained. The defendant violated a specific charge of the Export Control Reform Act, of which he and his co-defendants did with full knowledge they were doing so. Further, HO did so knowing law enforcement had been monitoring their conduct no later than early February 2025.

The defendant intentionally shipped Graphics Processing Units (GPU) produced by NVIDIA to China when the sale of those GPUs were banned from being exported to China. The export ban was in place because the sale of these GPUs to China endangered the national security of the United States, the preeminent threat to our sovereign nation.

On motion from the United States that the defendant poses a serious risk of flight, obstruction, or witness tampering, see 18 U.S.C. § 3142(f)(2)(A)-(B), a court shall hold a hearing to determine if there is a condition or combination of conditions that will reasonably assure the safety of any other person and the community. The burden of proof as to risk of flight is a preponderance of the evidence and the burden as to dangerousness is clear and convincing evidence. 18 U.S.C. § 3142(f); see *United States v. Quartermaine*, 913 F.2d 910, 915 (11th Cir. 1990). A "'finding of either danger to the community or risk of flight will be sufficient to detain the defendant

pending trial.'" King, 849 F.2d at 488 (quoting *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985)).

In King, the Eleventh Circuit observed that the term dangerousness as used in the Bail Reform Act of 1984 is much broader than that term is understood in everyday parlance. *Id*. at 487 n.2. The Court focused on the report of the Senate Judiciary Committee in delineating the types of conduct which Congress viewed as dangerous.[1]

The factors to consider are (1) the nature and circumstances of the charged offense; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community the defendant's release poses. 18 U.S.C. § 3142(g).

While Judge Sansone only found a risk of flight as the basis for detention, the dangerousness inherent in violations of the Export Control Reform Act can be, if not should be, also considered in the risk of flight analysis.

In early March 2023, LI flew into Tampa, Florida to meet with HO to register Janford Realtor LLC with Florida Secretary of State and create joint business

---

[1] The concept of defendant dangerousness is described throughout this chapter by the term safety of any other person or the community. The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence. This principle was recently endorsed in United States v. Provenzano and Andretta, 605 F.2d 85 (3rd Cir.1979), in which it was held that the concept of danger as used in current 18 U.S.C. § 3148 extended to non- physical harms such as corrupting a union. King, 849 F.2d at 487 n.2. (citing Report of the Senate Committee on the Judiciary, S. Rep. No. 98 225, 98th Cong., 2d Sess. (1984) U.S. Code Cong. & Admin. News 3182, 3195 96).

accounts. LI and HO were both listed as manager on the corporate registration, with an address of HO's residence in Tampa.

Beginning in September 2023, Mathew HO and Cham LI discussed a business plan to get NVIDIA GPUs to China. In text messages, they directly referenced LI's father engaging in similar business on behalf of the "CCP," or Chinese Communist Party, who would assign procurement to local Chinese governments, who would then hire LI's dad to procure the products.

> LI: If we can find Nvidia H800 to resell to China it's profit time. **Don't bother with H100 federal banned its sales to China**, H800 is the water down version of it so China can never catch up with the speed of H100.
> . . .
> HO: Who are you selling it to?
> . . .
> LI: Inspur, tencent . . . And Weibo. These big 3 are all looking for H800 GPU.
> . . .
> HO: This is your dad's gig?
> LI: It is. We just gotta make sure we profit first.
> HO: He's ALWAYS giving us false hope and then screw us under. How legit is his thing[?]
> LI: Very. Because **it's directly requested by those big 3. And you know those are usually related to government**. And government assign this purchase to local government. And then assigned to my dad eventually.
> HO: **The last time we dealt with them remembered what happened?** We wasted almost 2 weeks and then nothing
> LI: **Typical CCP operations**. Yeah that's why **this time we play different**. I give u all the info.
> [Discussion of past problems dealing with China]
> LI: U only ask 3 questions: How many they can sell, how fast they can sell and is it able to pick up directly in China port. If they say no don't persuade.
> . . .
> HO: Yeah, we are responsible to just get it and ship out of us. Whether if it can go into China or not that's on him.

LI and HO also discussed commerce regulations and ECCNs (whether a permit is required).

On October 31, 2023, LI sent HO a WhatsApp message containing the webpage for Department of Commerce Bureau of Industry and Security Commerce Control List and Export Classification followed by "he said ECCN is required".

LI sent HO a news article titled: **U.S. tells Nvidia to halt shipping some AI chips to China immediately** (https://asia.nikkei.com/Politics/International-relations/US-China-tensions/U.S.-tells-Nvidia-tohalt-shipping-some-AI-chips-to-China-immediately). HO responded, "we won't have [an ECCN] until we talk to brian no?," referencing Brian RAYMOND, a supplier of Nvidia GPUs with whom they were speaking at the time.

Between October and November 2023, HO and RAYMOND exchanged emails concerning prices for Nvidia A800, A100, and H100 GPUs. RAYMOND offered to source the GPUs directly from Hong Kong "so there are no issues." On November 8, 2023, at HO's request, RAYMOND sent multiple documents confirming that Bitworks was an official NVIDIA distributor.

In January 2024, HO and RAYMOND discussed via text message ways to get controlled technologies into China, and HO explained that they would go through Taiwan before being taken offline and moved to China:

Later in January 2024, HO and RAYMOND discussed using Bitworks as the end user "to side step any questions that would be asked by Nvidia":

HO: Brian, so for the authorization letter, can you also request an effective date to be written on there in the content? Along with the Janford realtor LLC info, just to be sure and we don't have to go back and forth.
RAYMOND: They agreed to do this as well, as long as Bitworks takes the liability on regarding the source of the payment. I need the end user details please.
RAYMOND: Really need the information as soon as you can get up… Since the original discussion was a US company (Janford) when working the deal they are putting it on me to be responsible for handling it, as an Nvidia cloud partner I can host and manage these systems for customers so it's a way to side step any questions they would be asked by Nvidia…
RAYMOND: With that said if I am going to be responsible I need to have all the details since I will be recorded as the Nvidia partner for those serial numbers and I need to determine this morning how to handle it.
HO: [Chinese Company 1 Signapore address and contact information][2]

HO rejected this proposal. He told RAYMOND to just use Janford as the end user, and they would then reexport to China after the fact, and then just keep the GPUs offline to avoid detection:

> RAYMOND: [Put Bitworks as the end user], we would arrange hosting for them since Bitworks is the formal end user (as an Nvidia Cloud Partner). We would field any support/warranty claims for them for the 3 year term Nvidia provides . . . .
> HO: We are good, they will ship to china after you change the end users to us. And on top of that, it'll be on intranet and never connect to the Nvidia cloud, whenever they need an update they will have us provide the update and do so offline

On February 12, 2025, federal agents conducted an interview of HO at his residence in Tampa, which was also Janford Realtor's registered address. At the time, the agents were unaware of Export #2, but HO showed them the purchase order during the interview.

---

[2] Chinese Company 1 is owned by the Chinese government through the China National Petroleum Corporation.

During the interview, a federal agent asked if HO exported a shipment of Nvidia chips to Malaysia. HO stated that he shipped "computer parts" to Malaysia and asked what the problem was. A federal agent advised it appears the items were Nvidia processor chips that would have required an approved license for export. HO replied he gave everything to United States Company 2 and it was up to them what to put on the paperwork.

When the federal agent showed the EEI from the first shipment to HO, HO said: 1) he was not familiar with the document, 2) did not know what "EAR99" meant, 3) did not know who Brilliant Supply Chain Service is, and 4) only recognized his business name (Janford Realtor LLC) listed as the USPPI and United States Company 2 listed as the Forwarding Agent. Virtually every detail in HO's response was false.

The Agents began asking HO about the export, his business, and his background. HO concealed any involvement of China and did not disclose to the agents that the products had been ultimately destined for China. HO provided the following information:

- HO started Janford Realtor LLC in 2023 with his partner, LI, in California to start buying multi-apartment residences, but they never bought or sold any property. Janford Realtor has not made any real estate transactions.

- HO purchased the chips from United States Company 1 in Texas for a customer in Malaysia. HO first stated that he did not know who the customer was in Malaysia, but later admitted it was Unindicted Co-Conspirator 1.

- Unindicted Co-Conspirator 1 told HO that he works for United States Company 1 in Malaysia and that a customer in Malaysia needed the computer parts, but Unindicted Co-Conspirator 1 needed a U.S. company to purchase and ship the parts. Unindicted Co-Conspirator 1 is in Malaysia and HO's other friend, "Harry" Chan, introduced Ho to Unindicted Co-Conspirator 1. Chan recommended HO to Unindicted Co-Conspirator 1 as someone who could help get the computer parts because HO had a business in the United States. Unindicted Co-Conspirator 1 needed the computer parts in Malaysia and was willing to pay HO a 2% service fee. HO thought this was good business opportunity.

- Unindicted Co-Conspirator 1 told HO that United States Company 1 does not export, so Unindicted Co-Conspirator 1 needed a U.S. Company to buy the parts from United States Company 1 and then export them to Unindicted Co-Conspirator 1 in Malaysia. Again, Unindicted Co-Conspirator 1 is employed by United States Company 1 in Malaysia and HO received a $5,000 commission for the first shipment after he paid for the parts and shipping.

- United States Company 2 picked up Export #1 from United States Company 1 and handled the export shipping. Ho said never saw the parts, and nothing was shipped to HO. HO arranged the pickup and export shipment with United States Company 2. Unindicted Co-Conspirator 1 sent the information to HO on WeChat about what to buy and who to ship it to. HO never met Unindicted Co-Conspirator 1 in person. HO does not know the end-user or the ultimate consignee of either export shipment to Unindicted Co-Conspirator 1. One shipment was in

November 2024 (Export #1) and the other was in January 2025 (Export #2).

- Export #2 was also made using United States Company 2. HO received a commission of $7,000. Unindicted Co-Conspirator 1 wired the money for the parts to HO's Janford Realtor LLC business bank account at Bank of America. There are no pending orders or payments from Unindicted Co-Conspirator 1.

- Unindicted Co-Conspirator 1 confirmed that he received the parts in Malaysia for both shipments. Unindicted Co-Conspirator 1 paid HO up front. Unindicted Co-Conspirator 1 had to pay up front because HO did not have the money to purchase the parts himself.

- HO did not know the parts were export controlled because they were just "computer parts".

- Unindicted Co-Conspirator 1 told HO that United States Company 1 does not have the export license needed to ship the parts to Malaysia. Unindicted Co-Conspirator 1 told HO this on WeChat. HO does not think he was smuggling the parts on behalf of Unindicted Co-Conspirator 1. HO just thought it was a good business deal to make money. HO did not think he needed any export license for the parts. HO did not think it was suspicious that Unindicted Co-Conspirator 1 worked for United States Company 1 and was unable to send the parts to himself in Malaysia. HO did not think it was suspicious that Unindicted Co-Conspirator 1 said United States Company 1 could not get an export license to ship to Malaysia.

The agents reiterated to HO the suspicious nature of his acquaintance, Unindicted Co-Conspirator 1, who worked for United States Company 1 while living

10

overseas, who was sourcing someone with a U.S. business to order and export computer chips that United States Company 1 sells, on behalf of unknown customers of Unindicted Co-Conspirator 1, by requiring HO to send an email to Unindicted Co-Conspirator 1 using the wording that Unindicted Co-Conspirator 1 provided. HO dropped his head and stated, "Yeah I could see that."

After the February 12, 2025 interview, HO tried to convince the agents he did nothing wrong. HO wrote:

> Attached is the screenshot I requested for the A100 from United States Company 1, along with the SLI and purchase order I submitted for United States Company 2. I believe this is a misclassification error due to an incorrect ECCN. I initially thought the ECCN was EAR99, but I was unaware that the correct classification is 4A090 until I was told by you.
>
> I did not intentionally omit the description of the shipped goods. I explicitly listed the A100 along with its corresponding part number on the SLI, which refers to the A100 I purchased from United States Company 1.
>
> During the shipment inquiry, I was informed by United States Company 2 representatives that they would be filing the EEI, the electronic export information form, which I understood to be the equivalent of the required export documents. My intention was never to violate any regulations—it was an honest mistake, and I want to make things right.
>
> If necessary, I can also provide the email history with both United States Company 2 and United States Company 1 to clarify the situation.
>
> Regards,
>
> Hon Ning Ho

One of the attachments HO sent was a copy of what purported to be the SLI for Export #1. HO had doctored the SLI to change the value to reflect $226,500 (from $100,000), and to change the ultimate consignee from Brilliant Supply Chain

(who he had claimed not to know in the interview) to Jaguar Airfreight.  Brilliant Supply Chain in Malaysia is a subsidiary of China Brilliant Supply Chain Service Co Ltd., headquartered in Shenzen, China.

A federal agent responded to HO, providing information on the EAR, ECRA, ECCN, CCL, and export licenses, among other topics.

HO sent these emails to RAYMOND, and they had the following discussion, showing that they believed that BIS was not aware of the full scope of HO's conduct and the fact that the GPUs had made it to China:

> RAYMOND: Did [the GPUs] get caught going into China and is that the issue?
> HO: No, they said I'm the claimed exporter who exported without an exporting license. Brian, so what's the ECCN code you used for h200? Or similar?
> RAYMOND: [responds with Nvidia export regulations website]
> HO: I have the wrong eccn. That's why
> RAYMOND: What did you use?
> HO: Ear99. But 4a090 requires an exporting license. That's why I was checking what eccn you're using
> RAYMOND: Those are different things… EAR99 is where they fall from a regulation standpoint. Ohhh are you saying even though they filed an EEI it was not filed for an A100?
> [Phone call]
> . . . .
> HO: **The department of commerce definitely scared me today**
> RAYMOND: Thankfully you have a good story
> **HO: the thought of picking up soap in prison crossed my mind**
> RAYMOND: Lol you would make Maine cigarettes for giving it up. On a serious note, you should consult with a customs attorney to get their read on it and make sure you say the right things.
> HO: I already said a lot though. But yeah.
> . . .
> HO: [Sends screenshots of emails from the Federal Agent]
> RAYMOND: Ok so as I expected. Training to help you be better.
> **HO: So I shouldn't be expecting jail time or fine I hope? Lol**
> RAYMOND: Actually you are most likely ok to export still

> HO: What makes you say that?
> RAYMOND: The email was a coaching email

On February 21, 2024, LI mentioned a Chinese customer who was going to send "specs" for products that she needed. HO responded, "But she knew it can't be ship directly to china yeah?" LI confirmed that the customer knew that, and that his father would ask someone else to help because "he has ways to import." In later messages on that day, LI and HO talked about how the Nvidia H100 GPU was banned from export to China.

From a summary of a portion of the evidence, it is clear the majority of the evidence against HO and the other co-defendants involves their text messages. The messages are all in English and detailed about the illegal scheme to export GPIs to China. It is clear HO knew the GPUs were to be illegally exported to China and supplied to companies with direct links to the CCP. HO and his co-codefendants knew the U.S. banning the exportation of the devices to China was due to the security threat China posed to the United States should they gain access to the most advanced processing chips NVIDIA produced. The applicable guidelines calculations are those that include the proceeds of national security threat enhancement and a role enhancement of either 2 or 4 levels, generating Total Offence Levels of 37/Criminal History Category I (210-262 months) or 35/Criminal History Category I (168-210 months).

Given the serious nature of the charges, the compelling evidence and the foreseeable applicable advisory guidelines, Judge Sansone reasonably determined all

three factors weighed in favor of detention.

What should also be considered is the defendant's determination to continue the illegal scheme when it was apparent law enforcement were aware of the scheme he was participating in and at least one co-defendant suggested they discontinue the illegal scheme. In addition to the February 12, 2025 interview with agents at his residence and the confiscation of his electronic devices upon his return to Florida from Aruba in August 2025, HO ignored the obvious peril he was placing himself in. At one point, LI suggested they stop attempting to export the GPUs to China. HO responded there were always ways to get around the exportation ban to China.

On May 6, 2025, HO received an email from an exporter, warning HO that the FBI was monitoring this type of activity and that it could have serious consequences. Exhibit One.

Having his electronics confiscated upon his return from Aruba similarly did not deter HO from abandoning the smuggling scheme. Surely HO realized examination of his devices would reveal additional details concerning the conspiracy to smuggle NVIDIA GPUs into China. Almost incredibly, HO dismissed the seizure of his devices to confusion on the part of the TSA/CBP officers. HO claimed they mistook him for a Mexican as the reason his electronics were confiscated.

In fact, law enforcement scrutiny caused LI and HO to change the business name of Janford, to Janford AI Solutions because the Chinese were skeptical why a Realtor would be involved in exporting GPUs and to pass compliance audits with

NVIDIA when dealing with vendors such as Dell.

LI asked HO if they should stop exporting the GPUs to China due to the agents visiting HO at his residence and the confiscation of HO's electronics upon his return to Florida from Aruba. HO responded there were always ways to get around the exportation ban to China.

LI claims HO's wife, Sherry, does not work and she had spoken with LI about divorcing HO. LI said HO paid off the mortgage on his parent's house and kept it in their name to protect it from being included the divorce settlement. LI does not know where HO got the money to pay off the mortgage.

HO also asked LI to pretend to be RAYMOND in a phone conversation with a potential Chinese buyer because RAYMOND was getting frustrated with Chinese buyers backing out of deals. LI agreed to pose as an imposter during the phone call and did so.

HO's finances are less than transparent. It appears HO receives bi-monthly payments that he did not disclose to pre-trial. In addition, agents at HO's home in February 2025 observed the interior of his residence had cameras in every corner of the interior and an unusually large volume of unused FedEx boxes. When questioned about the FedEx boxes, HO explained he resells casual and athletic shoes on ebay. Any income for this source was not disclosed to pre-trial.

Judge Sansone found HO had significant ties to China. His parents remain there. The defendant failed to disclose that he possessed a current British (British National Overseas) passport to pre-trial. The passport does not expire until 2029

and he used it recently to go on a cruise. Fortunately, agents discovered the passport during a search of HO's house and confiscated it. Should it have remained undiscovered HO could have used it to flee to China and avoid extradition. Moreover, HO could still obtain a replacement claiming it was lost or stolen.

Judge Sansone was justified finding HO's failure to appear in Court as ordered for his 2016 traffic citation weighed in favor of detention. At the time, HO was in the United States on an F1 student visa. Since HO had already graduated from USF, by 2016 he had overstayed his student visa and could have been deported.

Finally, on December 10, 2025, Deputies at the Pinellas County Jail seized a note HO had written in Chinese and delivered it to co-defendant, Jing Chen. Surveillance cameras captured HO calling for Chen to come to his cell and handed him the note. A copy and English translation are attached. Exhibit Two. This note reflects HO's attempt to obstruct justice and, once again, disrespect the U.S. legal system

Therefore, the United States submits this Honorable Court should find the United States has established by a preponderance of evidence the defendant is a risk of flight and should be detained.

>Respectfully submitted,
>
>GREGORY W. KEHOE
>United States Attorney
>
>BY: /s/Joseph K. Ruddy
>Joseph K. Ruddy
>Assistant United States Attorney
>United States Attorney No. 037
>400 N. Tampa Street, Suite 3200
>Tampa, Florida 33602-4798
>Telephone: (813) 274-6000
>Facsimile: (813) 274-6358
>E-mail: Joseph.Ruddy@usdoj.gov

U.S. v. HON NING HO                                          Case No. 8:25-cr-530-CEH-LSG

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Mark J. O'Brien, Esq.

BY: /s/Joseph K. Ruddy
Joseph K. Ruddy
Assistant United States Attorney
United States Attorney No. 037
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Joseph.Ruddy@usdoj.gov